## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

====*Electronically Filed*====

| | | |
|---|---|---|
| **DIANNE FUQUA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:**  4:24-cv-89-DJH |
| | ) | |
| **SCIPLAY CORPORATION,** | ) | |
| <u>Serve</u>:  Kentucky Registered Agent | ) | **STATEWIDE RELIEF SOUGHT** |
|       Corporation Service Company | ) | |
|       421 West Main Street | ) | |
|       Frankfort, KY    40601 | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SCIPLAY GAMES, LLC,** | ) | |
| <u>Serve</u>:  Kentucky Registered Agent | ) | |
|       Corporation Service Company | ) | |
|       421 West Main Street | ) | |
|       Frankfort, KY    40601 | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff, Dianne Fuqua, by counsel, states as follows as to her claims brought in this civil action against Defendants, SciPlay Corporation and SciPlay Games, LLC:

**THE "SOCIAL CASINO" GAMES AT ISSUE PREY UPON
KENTUCKY RESIDENTS AND ARE ILLEGAL GAMBLING
UNDER THE LAW**

1.      In the last fifteen years, slot machine makers have found a lucrative new way of doing business. In the past, slot machine venues were limited to casinos and other businesses that attract gamblers to come into an establishment and gamble money on slots and other gambling schemes. Now, companies such as Defendants, SciPlay Corporation and SciPlay Games, LLC (hereinafter "SciPlay"), have leveraged the power of modern smartphones, tablets, and computers to smuggle illegal slot machines into the homes and workplaces of Americans, where gamblers can satisfy their gambling addiction 24 hours a day, 365 days a year, without having to leave their homes or places of work. These new slot machine applications, misleadingly referred to as "social casino games," are nothing more than slot machines that can be carried in one's purse or pocket. Those addicted to slot machines no longer have to travel to a casino. Now they can gamble real money from home, work, restaurants, the grocery store, while on vacation, and anywhere else where the gambler's device can receive signal.

2.      It is scarcely a defense that "social casino" slot machines do not afford gamblers the opportunity to win real money because the currency in such games consists of "virtual coins" that are only redeemable as additional opportunities to play the games. This is so for at least two reasons. First, those with gambling

addictions have been documented to lose thousands of dollars playing these slot machines, to the point of financial ruin and marital strife, even though these gamblers could never win their money back – only the opportunity for additional spins at the slot machine. Second, the law in many states, including Kentucky, states that the opportunity to win additional playing time is a "thing of value" such that gambling for more playing time is illegal gambling even though the gambler never has the opportunity to win her money back. KRS § 528.010 (11) (defining "something of value" within the meaning of Kentucky's gambling statutes as including "a privilege of playing at a game or scheme without charge").

3.      The social ills caused by "social casino" games are well-documented. Media reports how gambling addicts spend enormous, and completely unaffordable, amounts of money on these casino games. One nurse in Houston is reported to play a slot machine game similar to Defendants' here for a minimum of two hours a day. (Ex. 1, https://www.nbcnews.com/tech/technews/addicted-losing-how-casino-apps-have-drained-people-millions-n1239604 (last accessed on Aug. 19, 2024)). Between her and her husband, who plays the game with her, she estimates they have lost $150,000. She asked NBC News to withhold her name "so her family does not find out how much money they have spent on the game." (Id.). She said her and her husband "lie in bed next to each other, we have two tablets, two phones and a

computer and all these apps spinning Reel Rivals at the same time. We normalize it with each other." (Id.). This is not an isolated instance.

> NBC News spoke to 21 people, including Shellz [the Houston nurse] and her husband, who said they were hooked on the casino-style games and spent significant sums of money. They described feelings of helplessness and wanting to quit but found themselves addicted to the games and tempted by the company's aggressive marketing tactics.
>
> Most of the 21 players wished to remain anonymous, as they were ashamed of their addictions and did not want their loved ones to find out about their behavior.

(Id.). For example, a "42-year-old Pennsylvania woman said she felt saddened that she spent $40,000 [on a social casino app that competes with defendants'] while working as an addiction counselor. 'The whole time I was working as an addiction counselor, I was addicted to gambling and with no hope of winning any money back,' she said."

4.    These anecdotal reports of gambling addictions in connection with social casino games like defendants' are buttressed by recent scientific studies that confirm that social casino apps appeal to gambling addicts in much the same way as real Las Vegas-style casinos, and have a particular appeal to teenagers. One of the more troubling statistics comes from studies that show that 30% of social casino gamers between the ages of 12 and 18 later become regular gamblers. Hollingshead, et al., "Motives for playing social casino games and the transition from gaming to gambling (or vice versa): social casino game play as harm reduction?" 46 Journal of

Gambling Issues 43 (2021). More broadly, over half of social casino players reported gambling on a regular basis. (Id.). Because of this overlap, traditional gambling operators are now heavily invested in defendants' industry as a way to port players from social casino games to real casinos. (Id.). One study showed that an astonishing 58.3 percent of gamblers seeking treatment for gambling addiction "reported social casino games as being their first introduction to gambling activities." Kim, "Social Casino Games: Current Evidence and Future Directions," Gambling Research Exchange Ontario.

5.    Companies in the Social Casino industry, including Defendants, have extracted tens of millions of dollars from Kentucky's economy in the last five years, all without employing a single person in the state or paying a dime in taxes to the Kentucky treasury. SciPlay is now a fully owned subsidiary of a company called Light & Wonder, and there is not a public report of its recent earnings. However, other social casino companies have released reports showing revenues of hundreds of millions or even more than a ***billion*** dollars. See, e.g., https://www.flux.finance/post/virtual-gaming-world-majorrevenue#:~:text= %F0%9F%91%89%20What%20happened%3A%20Last%20week,of%20more%2 0than%20%24377%20million. (last accessed July 23, 2024). Even if Kentucky consumers represent but a small percentage of that total, the reality is that a great deal of money is being removed from the state's economy each year. Again, this

money leaves the Commonwealth without creating any Kentucky jobs or generating any tax revenue for the treasury.

## PARTIES, JURISDICTION, AND VENUE

6.    Plaintiff, Dianne Fuqua, is a citizen of the Commonwealth of Kentucky, and resides at 1417 Benton Avenue in Owensboro, Daviess County, Kentucky, 42301, which is within this district and division.

7.    Defendant, SciPlay Corporation, is a corporation organized under the laws of the State of Delaware, with its principal place of business at 6601 Bermuda Road  in Las Vegas, Nevada, 89119. It does business through its online games throughout the United States, including in this district and division. It does not have a physical location in the Commonwealth of Kentucky.  Defendant has appointed the following as its Registered Agent in Kentucky:  Corporation Service Company, 421 West Main Street, Frankfort, Kentucky, 40601.

8.    Defendant, SciPlay Games, LLC, is a limited liability company existing under the laws of the state of Nevada, with its principal place of business at 6601 Bermuda Road  in Las Vegas, Nevada, 89119. It does business through its online games throughout the United States, including in this district and division. It does not have a physical location in the Commonwealth of Kentucky.  Defendant has appointed the following as its Registered Agent in Kentucky:  Corporation Service Company, 421 West Main Street, Frankfort, Kentucky, 40601.

9.     Federal court subject matter jurisdiction is present in this case pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332, as there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

10.     Venue is appropriate in this district and division pursuant to 28 U.S.C. § 1391(b)(3), since this Court has personal jurisdiction over the Defendants based on their conduct in collecting illegal gambling winnings from residents of this state, district, and division.

## LEGAL BACKGROUND

### A.     Kentucky's Loss Recovery Statute and the <u>Stars Interactive</u> Case

11.     This case is brought under Kentucky's gambling loss recovery act, a statutory *qui tam* relator cause of action based on the English Statute of Anne of 1710. KRS § 372.040. The statutory scheme first gives the loser of a gambling game, or his creditor, the right to recover his losses from the winner.  KRS § 372.020. The statute then provides:

> If the loser or his creditor does not, within six (6) months after its payment or delivery to the winner, sue for the money or thing lost, and prosecute the suit to recovery with due diligence, ***any other person*** may sue the winner, and recover treble the value of the money or thing lost, if suit is brought within five (5) years from the delivery or payment.

KRS § 372.040 (emphasis supplied).

7

12.    The purpose of this statute is the deterrence of gambling. The Kentucky Legislature placed such a premium on deterring gambling activity that it not only made it illegal, but also allowed any person in the state to bring a suit to deprive those who profit from illegal gambling, like the Defendants from their ill-gotten gains, and to make them think twice about gambling in Kentucky again by trebling that recovery.

13.    In a suit brought, like this one, pursuant to Section 372.040, the Kentucky Supreme Court recently affirmed a $870,690,233.82 judgment against a company promoting illegal gambling. Commonwealth v. Stars Interactive Holdings (IOM) Ltd., 617 S.W.3d 792 (Ky. 2021). The Commonwealth of Kentucky brought that suit, like Plaintiff brings this suit, to recover losses suffered by all citizens of Kentucky who had lost money playing Defendants' illegal gambling games, for the benefit of the Commonwealth, not those who lost gambling.

14.    The principal issue on appeal in Stars Interactive was whether the Commonwealth of Kentucky was a "person" within the meaning of Section 372.040. Reversing the Court of Appeals' determination that only natural persons qualified as "any other person" within the meaning of the statute, the Kentucky Supreme Court instead gave the language the broadest possible meaning. The court wrote:

> Nothing in the text of KRS 372.040 mentions or even suggests that the statute is limited to "natural persons." On the contrary, the General Assembly chose to modify the noun "person" with the adjective "any"—"any other person." This Court's predecessor held that the word

"any" means "one indiscriminately of whatever kind or class; one, no matter what one" and "is an indefinite pronominal adjective . . . used to designate objects in a general way without pointing out any one in particular." <u>Elliot v. Pikeville Nat'l Bank & Co.</u>, 278 Ky. 325, 128 S.W.2d 756, 761 (1939) (internal quotation marks and citation omitted). By using the phrase "any other person," the General Assembly plainly expressed that it meant to confer standing on all the kinds and classes of "person[s]" listed in KRS 446.010(33) without exception.

<u>Id.</u> at 798. The <u>Stars Interactive</u> case did not find that the Commonwealth could bring the case because of its special status as the sovereign—quite the opposite in fact. The Commonwealth's ability to bring the case stemmed not from any right as sovereign but from the fact that KRS 372.040 gave it the same right as any other person. It is thus a necessary implication of the Kentucky Supreme Court's holding that any individual citizen could likewise have brought the case and recovered treble the total amount of money the Poker Stars site made in Kentucky from its illegal gambling games.

15.    The <u>Elliot</u> case cited in <u>Stars Interactive</u> goes on to quote the Webster's Dictionary definition of "any": "Indicating a person, thing or event, *** not a particular individual of the given category but whichever one chance may select; this, that or the other; one or another." <u>Elliot</u>, <u>supra</u>, 128 S.W.2d at 761.  To understand just how broad this language is, one must look at the cited definitional statute, KRS §446.010(33), which for purposes of Kentucky statutes defines "person" as follows:

> "Person" may extend and be applied to bodies-politic and corporate, societies, communities, the public generally, individuals, partnerships, joint stock companies, and limited liability companies.

Thus, both the plain statutory language and controlling Kentucky caselaw establish that *any* individual may bring this action to recover the losses of all Kentucky residents who gambled on respondents' illegal gambling games, just as the Commonwealth of Kentucky did in <u>Stars Interactive</u>. In addition to the Stars Interactive case, private plaintiffs suing companies like Defendants have prevailed or settled to the tune of hundreds of millions of dollars in other states that have similar statutes, based on those statutory claims.

## B.    Kentucky's Definition of Illegal Gambling and the Non-Retroactive Changes to It.

16.    Absent specific legislative authorizations that are not applicable to this case, Gambling is illegal in Kentucky. Kentucky law makes it illegal to spend money to try to win "something of value." Before June 29, 2023, the definition of something of value was a single paragraph, found at 528.010(15) of the Kentucky Revised Statutes:

> "Something of value" means any money or property, any token, object, or article exchangeable for money or property, or any form of credit or promise directly or indirectly contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment, or a privilege of playing at a game or scheme without charge.

K.R.S. § 528.010(15)(a). As will be explained in detail below, Defendants' games allowed players to spend real money to purchase virtual coins which the players then gamble in the hopes of winning additional coins that allow them to continue playing the game without an additional charge, clearly making those coins "something of value" within this definition.

17.    Numerous Kentucky cases make it clear that "free play" or the right to continue playing a game of chance without paying more money, was "something of value" under Kentucky law and that games where customers paid money to try to win free play were illegal gambling. . <u>Beets v. Commonwealth</u>, 437 S.W. 2d 496, 498 (Ky. Ct. App. 1969) (testimony that a machine "just gave free games… just like 'they all do'" was sufficient to sustain conviction for illegal gambling); <u>U.S. v. H.M. Bransom Dist. Co.</u>, 398 F.2d 929 (6th Cir. 1968) (affirming jury verdict that machines which only awarded free games were illegal gambling devices under Kentucky law); <u>A.B. Long Music Co. v. Com.</u>, 429 S.W. 2d 391, 393 (Ky. Ct. App. 1968) (affirming jury verdict that machines were gambling where pinball machine had "a multiple free-game device."); <u>Steely v. Commonwealth</u>, 164 S.W.2d 977, 979 (Ky. App. 1942) ("there is also a plus value, which is the chance of obtaining another or a number of free rights to additional plays"); <u>Trowbridge v. Commonwealth</u>, 369 S.W. 2d 6 (Ky. App. 1963) (machines that registered winnings only in free games

found illegal); <u>U.S. v. Two Coin-Operated Pinball Machines</u>, 241 F. Supp. 57 (W.D. Ky. 1965) (same).

18.    The Kentucky Legislature added an additional section to the definition of "something of value" in June of 2023. This section reads as follows:

> "Something of value" does not include the award of a free, extended, or continuous play which is awarded as a prize for playing a game or scheme for a charge

K.R.S. § 528.010 (15)(b).

19.    This new definition clearly represented a change in the law that cannot be applied retroactively. A Kentucky statute makes it absolutely clear that changes in law are not to be applied retroactively unless the Legislature explicitly says so:

> No statute shall be construed to be retroactive, unless expressly so declared.

K.R.S. § 446.080. <u>See also</u> <u>William A. Pope Co. v. Howard</u>, 851 S.W. 2d 460, 462 (Ky. 1993) (noting the "general rule" that "statutory amendments" are not applied retroactively.); <u>University of Louisville v. O'Bannon</u>, 770 S.W. 2d 215, 217 (Ky. 1989) (holding statute had no retroactive application where "[t]he application of the legislative act to the facts in this case would produce a retroactive limitation on the right of the plaintiffs to recover which did not exist… at the time of the commencement of the suit.")

C.      **Dianne Fuqua Has Standing to Bring this Case in Federal Court.**

20.      As noted above, Kentucky's statute gives "any other person" the ability to bring claims like those Plaintiff is bringing here. The United States Supreme Court has repeatedly recognized that statutory *qui tam* relator causes of action like KRS § 372.040 give "any other person" standing to bring the action. <u>Sprint Communications Co. L.P. v. APCC Services, Inc.</u>, 554 U.S. 269 (2008); <u>Vermont Agency of Natural Resources v. United States ex rel. Stevens</u>, 529 U.S. 765 (2000); <u>Marvin v. Trout</u>, 199 U.S. 212, 225 (1905). Indeed, in <u>Marvin v. Trout</u> the Supreme Court was faced with an Ohio gambling loss recovery act based on the Statute of Anne that is virtually identical to Kentucky's. O.R.C. § 3763.04. After explaining that the purpose of the statute was to discourage gambling and holding that it did not offend the due process clause of the fourteenth amendment, the court turned to the issue of allowing a third party to recover:

> To say that [such a statute] must be limited to a provision allowing a recovery of the money by the one who lost it, would be in effect to hold invalid all legislation providing for proceedings in the nature of *qui tam* actions. Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country since the foundation of our government. The right to recover the penalty or forfeiture granted by statute is frequently given to the first common informer who brings the action, although he has no interest in the matter whatever except as such informer.

119 U.S. at 225 (citations omitted). The U.S. Supreme Court also noted that this analysis was not affected by whether a particular state gave the party all the money or a "moiety." Id.

21.     Various forms of *qui tam* actions continue to exist, including this one. The Supreme Court has determined that relators bringing such cases have standing to sue in federal court under Article III of the United States Constitution. Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765 (2000). According to Justice Scalia, who wrote for the Court, this conclusion was buttressed by historical considerations:

> We are confirmed in this conclusion by the long tradition of *qui tam* actions in England and the American Colonies. That history is particularly relevant to the constitutional standing inquiry since, as we have said elsewhere, Article III's restriction of the judicial power to "Cases" and "Controversies" is properly understood to mean "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."

529 U.S. at 774. Justice Scalia then recounted the long history of such actions in England, the American Colonies, and the United States, stretching back to the 13th century going all the way up to modern *qui tam* cases such as those brought under the False Claims Act. The Court then wrote:

> We think this history well-nigh conclusive with respect to the question before us here: whether *qui tam* actions were "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."

529 U.S. at 777. The <u>Stevens</u> court concluded that a relator had standing under the False Claims Act pursuant to the assignment of such claims by the government to that individual under the statute. Similarly, Kentucky's loss recovery statute operates as an assignment of rights held by third parties to "any person," including Plaintiff.

22.    The Supreme Court spoke to the issue again in 2008, this time in the context of "aggregators" who had been assigned multiple small claims to bring on behalf of the assignors, who stood to recover the entirety of the claims minus a fee paid to the aggregator. <u>Sprint Communications Co. L.P. v. APCC Services, Inc.</u>, 554 U.S. 269 (2008). The defendant there argued that there was no Article III standing because the aggregators themselves did not suffer any injury based on the defendant's conduct. The Court rejected this argument, holding:

> It is true, of course, that the aggregators did not suffer any injury caused by the long-distance providers; the payphone operators did. But the payphone operators assigned their claims to the aggregators lock, stock, and barrel. . . . And within the past decade we have expressly held that an assignee can sue based on his assignor's injuries.

554 U.S. at 286. Having held that the assignors' injury sufficed to confer standing on the assignee aggregators, the Court stated as follows in response to the defendant's argument that the aggregators lacked standing because they did not stand to participate in the recovery:

> And if the aggregators prevail in this litigation, the long-distance carriers would write a check to the aggregators for the amount [owed]. What does it matter what the aggregators do with the money afterward? The injuries would be redressed whether the aggregators remit the

litigation proceeds to the payphone operators, donate them to charity, or use them to build new corporate headquarters. Moreover, the statements our prior cases made about the need to show redress of the *injury* are consistent with what numerous authorities have long held in the assignment context, namely, that an assignee for collection may properly bring suit to redress the injury originally suffered by his assignor.

554 U.S. at 287 (emphasis in original). Here, Plaintiff has standing because the law has assigned him the right to recover the gambling losses of other Kentucky residents.

### FACTUAL ALLEGATIONS

**A.    SciPlay's Games are Games of Chance**

23.    SciPlay makes available online games in a variety of formats, including through smart phone applications (apps) such as Jackpot Party Casino, Quick Hit Casino, and Gold Fish Casino. SciPlay's apps offer casino-style games, including slot machines. Below is a typical example of such games:



24.    Each of these games are games of chance under Kentucky law, which defines gambling as "a contest, game, gaming scheme, or gaming device which is based upon an element of chance." K.R.S. § 528.010(6)(a). Each of the games available on SciPlay's platforms contain an element of chance.

**B.    SciPlay's Games are Illegal Gambling**

25.    As noted above, Kentucky defines illegal gambling as risking something of value on a game of chance to try to receive something of value. Defendants' games clearly allow players to spend money on virtual chips, which have no purpose other than to be risked on games of chance to try to win more chips. The first element of the definition (risking something of value) is thus met, as is the element requiring a game of chance. The games also allow players to recover additional chips that allow them to continue playing—if they keep winning, they do not have to purchase more chips to keep playing. As explained above, before June 29, 2023, Kentucky law defined such additional playing time as "something of value."

26.    Customers initially receive some free coins to play the games. They then spend coins to play the game. For example, on the slot type games customers spend some of their coins to spin the reels and win or lose based on the alignment of symbols on the reels just as they would on a physical slot machine. If they lose, they lose the coins wagered. If they win, they win additional coins allowing them to play

longer. When a consumer runs out of coins entirely, they must spend real money to purchase coins if they wish to continue playing the game with full functionality. Customers who purchase these coins do so to bet them in the same manner described above.

27.    SciPlay, or the platform providers like Google, Apple, or Facebook, or all of them, can identify each Kentucky resident who played Defendants' games, as well as the amounts and dates of their gambling losses. This is information easily obtained in discovery, as it was in the <u>Stars Interactive</u> case discussed above.

28.    Players of Defendants' games pay real money to purchase coins, which they then wager in the hopes of winning more coins so that they can continue to play without making additional purchases. They make this wager on the outcome of the spin of a slot machine or the results of other gambling games.

**C.    SciPlay Has the Capability to Avoid Having Customers in Jurisdictions Where the Games are Illegal.**

29.    The technology exists that would allow SciPlay to stop allowing its games to be played by Kentucky residents, or, in fact, to never have allowed them to be played while the games were clearly illegal. This technology is known as geofencing.

30.    Online companies use tools that target or avoid specific geographical areas or jurisdictions all the time. For example, they deliberately avoid particular

jurisdictions to blackout local sports events to boost ticket sales, or to avoid overseas jurisdictions where certain content is unwelcome or illegal.

31.    In Kentucky itself, the Legislature recently passed a statute legalizing and regulating certain kinds of online sportsbook betting. As part of that legislation, the Legislature required registered sportsbook operators to only allow those physically present in Kentucky to make bets:

> A sports wagering licensee or service provider shall utilize geolocation or geofencing technology to ensure that wagers are only accepted from patrons who are physically located in the Commonwealth.

K.R.S. 230.805(3)(g).

32.    Online gaming companies clearly have the technology to prevent users from accessing their games in particular jurisdictions. Other social casino operators have done precisely that. SciPlay competitor VGW recently pulled out of the state of Michigan, and other companies have pulled out of other states using geofencing technology. (Ex. 2, PlayUSA, Prominent Social Casino Operator Pulling Out of Michigan, May 1, 2024, https://www.playusa.com/chumba-exiting-michigan-online-casinos/ (last visited Aug. 19, 2024)). SciPlay could have done the same here, but it chose to continue victimizing Kentucky residents throughout the period when the games were clearly illegal.

## CLAIM FOR RELIEF

33.    Pursuant to Kentucky Revised Statutes Section 372.040, Plaintiff is entitled to a judgment in his favor for all of the gambling losses of Kentucky residents who played Defendants' illegal gambling games during the statute of limitations time period.

## PRAYER FOR RELIEF

Plaintiff prays the Court to:

1.    Take jurisdiction over this action;

2.    After discovery, enter a judgment in Plaintiff's favor for treble the total of all Kentucky resident's gambling losses during the relevant time;

3.    Award interest, costs, and any other relief to which Plaintiff is entitled.

This 22nd day of August, 2024.


RHOADS & RHOADS, PSC

/s/ Christopher L. Rhoads
Christopher L. Rhoads
115 East Second Street
P.O. Box 2023
Owensboro, KY  42302-2023
Tel.:    (270) 683-4600
Fax:    (270) 683-1653
chris@rhoadsandrhoads.com

and

John E. Norris
Dargan Ware
DAVIS & NORRIS, LLP
The Bradshaw House
2154 Highland Avenue South
Birmingham, AL  34205
Tel.:    (205) 930-9900
jnorris@davisnorris.com
dware@davisnorris.com

ATTORNEYS FOR PLAINTIFF